UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────────────

PHILLIP H. OWENS,

                       Plaintiff,

v.                                                    Case # 21-CV-6445-FPG

                                                              DECISION AND ORDER

THE COUNTY OF MONROE,

                       Defendant.
───────────────────────────────────────

## INTRODUCTION

This case involves a dispute between an individual, Phillip H. Owens ("Plaintiff"), and the County of Monroe ("Defendant"), alleging that Monroe County District Attorney ("DA"), employed unlawful administrative policies that caused Plaintiff to be wrongfully convicted of a crime he did not commit and to spend time in prison as a result. *See* ECF No. 1 ("Compl."). Because the DA is the policymaker for the Defendant, Plaintiff asserts that Defendant is liable pursuant to 42 U.S.C. § 1983 and *Monell v. City of New York*, 436 U.S. 658 (1978). Compl. ¶ 7.

Defendant filed a motion to dismiss Plaintiff's claims on the grounds that Plaintiff failed to meet his pleading burden in articulating a claim for *Monell* liability against the Defendant. ECF No. 5. For the reasons set forth below, Defendant's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND[1]

On May 31, 2021, Tara Owens, Plaintiff's estranged wife, called 911 and falsely reported that Plaintiff had fired gun shots from a convenience store at her and their three-year-old son. Compl. ¶ 18. Specifically, Tara told the police that an hour earlier, she was driving her green

---

[1] Unless otherwise noted, the following allegations are accepted as true from Plaintiff's Complaint.

1

Lexus down Magnolia Street, in Rochester, New York, with her son, on her way to her mother-in-law's house, when Plaintiff fired shots at her. *Id.* ¶ 19. At trial, Tara elaborated that she was driving her green Lexus from Shelter Street, down Manila Street, and then down Magnolia Street towards Genesee Street. *Id.* ¶ 20, 21. Then, Tara testified that she waited at an intersection. *Id.* ¶ 22. While waiting, she heard a gunshot and turned to see Plaintiff shooting at her. *Id.* ¶ 23.

However, Tara and her son were not present at the corner of Genesee Street and Magnolia Street on May 31, 2012 in a green Lexus, nor was Plaintiff. *Id.* ¶¶ 27, 28. Surveillance video from a convenience store at the location did not show the alleged shooting, however, it did show that minutes prior to the alleged shooting, Tara and two young boys were inside the store. *Id.* ¶¶ 29-31. Then, the two boys exited the store and got into a blue Nissan Altima. Compl. ¶ 32. After purchasing a beverage, Tara left the store and got into the blue Nissan Altima. *Id.* ¶¶ 33, 34. At 3:24:16 p.m., Tara pulled out of the parking lot in the blue Nissan Altima and drove away. *Id.* ¶ 36. Yet, according to the prosecution, at 3:26:02 p.m., Tara arrived back at the store, driving from the opposite direction, in a green Lexus with just her son in the back seat, and a shooting occurred. *Id.* ¶ 37. This is contrary to the video footage. *Id.* ¶¶ 38, 39.

Indeed, prior to trial, Tara recanted her statements to police and advised that she could not testify against Plaintiff because she did not see him shoot at her. *Id.* ¶¶ 40-43. In response, prosecutor William Gargan told Tara that if she did not testify, she would be arrested for perjury and Child Protective Services would remove her children. Compl. ¶ 44. Pursuant to Defendant's policy, no notes were taken during Tara's meeting with Mr. Gargan, nor was the statement disclosed to Plaintiff or his attorney. *Id.* ¶¶ 45, 47. Furthermore, the surveillance video, which showed Tara's initial claim to the police was false, was never disclosed to Plaintiff or his attorney in viewable format. *Id.* ¶ 51.

Despite this lack of disclosure, Plaintiff discovered the discrepancy in Tara's story when she testified at trial. *See id.* ¶¶ 53-59. On cross examination, Tara admitted that her statement to the police, as recorded, was inaccurate, but that she already corrected it. *Id.* ¶¶ 60-63. When she testified that she corrected it, Mr. Gargan objected as she was referring to her meeting with the prosecutor. *Id.* ¶¶ 65-66. The objection was sustained. Compl. ¶ 67.

During closing arguments, Mr. Gargan played the entirety of the surveillance footage for the first time. *Id.* ¶ 70. Plaintiff noticed that the video showed Tara inside the convenience store just *before* the alleged shooting, and also showed two boys exit the store and get into the blue Nissan Ultima; Tara followed. *Id.* ¶¶ 76-79. After the prosecution completed closing statements, Plaintiff's attorney brought forward proof of actual innocence, including, Tara's appearance in one of the video frames, and the identification of the Nissan Ultima as belonging to Tara's boyfriend's mother. *Id.* ¶ 86, 87. Accordingly, Plaintiff's attorney asked the court to reopen proof so that he could cross-examine Tara regarding the video; the court denied the request. *Id.* ¶¶ 88, 93. Plaintiff's attorney then unsuccessfully moved for a mistrial. *Id.* ¶¶ 93, 94.

The jury acquitted Plaintiff of attempted murder and reckless endangerment but convicted him of attempted assault in the first degree, criminal possession of a weapon in the second degree (two counts), and criminal possession of a weapon in the third degree. Compl. ¶ 98. He was sentenced to concurrent terms of 13 years. *Id.* ¶ 102.

After trial, Plaintiff moved to set aside the verdict pursuant to CPL § 330.30, which was denied. *Id.* ¶¶ 103, 106. On appeal, the DA's Office conceded that the woman in the video was Tara. *Id.* ¶ 109. The DA's Office further conceded that Plaintiff's conviction should be reversed but refused to file a joint CPL § 440 motion. *Id.* ¶ 112. In response, Plaintiff's counsel moved to dismiss the indictment and to expedite Plaintiff's release on December 29, 2017. *Id.* ¶ 113. On

3

March 16, 2018, while the motion was still pending, the Appellate Division reversed Plaintiff's conviction and remanded the case for a new trial.[2]  Compl. ¶ 114.

Prior to re-trial, Tara would not cooperate or discuss the case with Mr. Gargan. *Id.* ¶ 119. After a material witness order was issued by the court, Tara was located and required to take the stand at the re-trial. *Id.* ¶ 122.  When she was called to testify, Tara refused, and ultimately, asserted her Fifth Amendment right against self-incrimination. *See id.* ¶¶ 124-128.  Finally, Mr. Gargan admitted he could not proceed, a trial order of dismissal was issued on June 13, 2018, and Plaintiff was released from jail. *Id.* ¶¶ 129, 130.

According to Plaintiff, Defendant maintains a policy of not taking notes when interviewing potential trial prosecution witnesses to "make sure that exculpatory or impeachment evidence . . . is not recorded . . . [and therefore] not disclosed to the defense." *Id.* ¶¶ 131, 32.  As a result of this policy, Mr. Gargan took no notes about Tara's statement that she did not see Plaintiff shoot at her and did not disclose that information to Plaintiff or his counsel.  Compl. ¶ 139.  Due to this policy, the DA's Office established a committee in 2020 to attempt to collect impeachment evidence. *Id.* ¶ 167.  Since 2020, the DA's Office has sent numerous criminal defense attorneys letters "admitting that in prior criminal prosecutions, their office withheld exculpatory and/or impeachment evidence of prosecution witnesses." *Id.* ¶ 168.

Plaintiff asserts that Defendant also maintains a policy of failing to discipline or sanction prosecutors who commit misconduct.  Plaintiff alleges that Defendant had notice of the misconduct through the numerous decisions overturning verdicts for various improprieties, including withholding of materials. *Id.* ¶ 174.  Furthermore, Plaintiff points to Defendant's failure to identify any records of attorney discipline as evidence of this policy. *Id.* ¶ 178, 179.

---

[2] The court reasoned that the video was material evidence directly relevant to determining whether Tara fabricated her story or was at the scene at the time of the alleged incident.  Compl. ¶ 115.

As a result of Defendant's improper conduct, through the DA's Office and the DA, Plaintiff was deprived of various constitutional rights. *See generally id.*

## LEGAL STANDARDS

### I.     12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief is plausible when the plaintiff pleads facts sufficient to allow the Court to draw reasonable inferences that the defendant is liable for the alleged misconduct. *Id.*  In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).  At the same time, the Court is not required to credit "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . [with] a presumption of truthfulness." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal citations and quotations omitted).  The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedures 8(a) and 12(b)(6) is plausibility." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61). To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679.

### II.    *Monell* Liability

"[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian v. Monroe Cnty., Alabama*, 520 U.S. 781, 784 (1997); *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978).  A plaintiff who seeks to impose liability on local governments

pursuant to 28 U.S.C. § 1983 must demonstrate that "action pursuant to official municipal policy" caused the injury. *Monell*, 436 U.S. at 692. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials,[3] and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Monell*, 436 U.S. at 691) (additional citations omitted). A plaintiff may demonstrate a policy or custom exists by showing:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

## DISCUSSION

Defendant moves to dismiss the Complaint, arguing that (1) Plaintiff fails to establish a *de facto* policy of not disciplining prosecutors for *Brady*[4] violations and presenting false or misleading argument, evidence or testimony, by citing to other cases that allegedly involve similar misconduct; (2) Plaintiff fails to sufficiently plead a failure to train claim in that the DA was deliberately indifferent to the deprivation of rights by failing to discipline prosecutors for *Brady* violations; and (3) Plaintiff fails to provide any support for the existence of a policy of directing

---

[3] Defendant does not contest that it can be held liable for the DA's practices at issue here.

[4] *Brady v. Maryland*, 373 U.S. 83 (1963).

prosecutors not to take notes when interviewing prosecution witnesses or being deliberately indifferent to such practices.  *See generally* ECF No. 5-3.

In response, Plaintiff maintains that his claims are adequately pled.  Specifically, he asserts that the *Brady* violation in his case resulted from longstanding deliberate indifference of the DA, as demonstrated by the DA's failure to discipline any prosecutor since at least 1998.  *See generally* ECF No. 9.  Additionally, Plaintiff maintains that the Complaint sufficiently alleges that the DA's Office trains prosecutors that impeachment materials related to prosecution witnesses do not have to be disclosed as evidenced, by the recent establishment of a *Giglio* committee and sending letters to attorneys regarding exculpatory and impeachment materials previously withheld.  *Id.*   The Court addresses each of Plaintiff's claims in turn below.

I.    **Failure to Discipline Prosecutors**

   A.  *De Facto* **Policy**

First, Plaintiff asserts that Defendant has (1) a *de facto* policy of refusing to disclose *Brady* material and presenting false and misleading evidence and testimony at trial; and (2) a policy of failing to discipline[5] or sanction trial prosecutors who commit misconduct.  Compl. at 18-28.  "To demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must 'show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'"  *Buari v. Ciy of New York*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (citations omitted)).  Plaintiff may adequately plead the existence of *de facto* customs or policies "by citing to complaints in other cases that contain similar allegations." *Gaston v. Ruiz*,

---

[5] As discussed herein, the failure to discipline resulting in a violation of constitutional rights and therefore, a "policy" for purposes of *Monell* liability is subject to a different standard than that applicable to determining whether a *de facto* policy exists.  Therefore, this claim will be evaluated under a deliberate indifference theory.

No. 17-CV-1252 (NGG) (CLP), 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018) (citing *Osterhoudt v. City of New York*, No. 10CV3173(RJD)(RML), 2012 WL 4481927, at *2 (E.D.N.Y. Sept. 27, 2012)).  The cited complaints "must involve factually similar misconduct, be contemporaneous to the misconduct at issue in [Plaintiff's] case, and result in an adjudication of liability." *Buari*, 530 F. Supp. 3d at 399 (citations omitted).

In an effort to plead a *de facto* policy based on a widespread practice of prosecutorial misconduct including the failure to disclose *Brady* materials and presenting false and misleading evidence and testimony at trial, Plaintiff cites various Appellate Division, Fourth Department cases wherein the court commented on Monroe County prosecutors' misconduct.  *See* Compl. ¶¶ 180, 185.  In addition to the cited cases, Plaintiff indicates that the DA's Office was aware of many other instances which led to prosecutions being "thrown out."  *See id.* ¶¶ 181, 182.  Plaintiff cites to 30 total cases, spanning about 30 years.  18 of the cases cited by Plaintiff involve misconduct which occurred *prior* to Plaintiff's prosecution, the remaining cases involve misconduct which occurred *after* Plaintiff's initial prosecution, but *before* Plaintiff's re-trial.

After reviewing each case cited by Plaintiff, the Court finds that he has not sufficiently pled a *de facto* policy or custom.  In total, only seven cases referenced by Plaintiff involve *Brady* violations, *id.* ¶¶ 180a, 180b, 180k, 180m, 180r, 185j, 185l, which occurred over the course of about 30 years, *see id.* ¶ 180r (citing *People v. Ausserau*, 77 A.D. 2d 152, 154-55 (N.Y. App. Div. 1980)), *id.* ¶ 185j (citing *People v. Carver*, 114 A.D.3d 1199 (N.Y. App. Div. 2014)).  In other words, Plaintiff alleges about one similar instance of misconduct involving *Brady* violations every four or so years.  In addition, five other cases cited by Plaintiff involved prosecutors improperly eliciting false or misleading testimony.  *See id.* ¶¶ 180c, 180n, 185c, 185d, 185k.  Again, the cases cover a span of almost 20 years.  This means that, taking Plaintiff's allegations as true, he alleges

8

about one similar instance of misconduct involving false or misleading testimony every four or so years.

Even drawing all inferences in Plaintiff's favor, such a small number of similar instances of misconduct, over the span of multiple decades, does not suggest that the practice is "so widespread as to have the force of law," *Bd. of Cnty. Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted), or "so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2d Cir. 1992) (citations omitted). *See, e.g.*, *Buari*, 530 F. Supp. 3d at 406 (plaintiff's 23 cited cases of misconduct occurring over a twenty-year period, was insufficient to establish that improper practice was so widespread as to have the force of law) (collecting cases). Therefore, this claim must be DISMISSED.

### B. Deliberate Indifference

A *Monell* claim may also be established by showing a "deliberate indifference" to a risk that a recurring situation will likely result in a constitutional violation. *See Davis v. City of New York*, 75 F. App'x 827, 829 (2d Cir. 2003) (summary order). To establish that a municipality's failure amounts to deliberate indifference, the plaintiff must show:

> (1) policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.

*Young v. Cnty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992) (internal quotations and alterations omitted)). Liability for

deliberate indifference can be based on two distinct theories: failure to train or failure to supervise/discipline. *See Amnesty America*, 361 F.3d at 127.

Under the failure to supervise or discipline theory, a plaintiff must plead "(1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Treadwell v. County of Putnam*, No. 14-cv-10137, 2016 WL 1268279, at *4 (S.D.N.Y. Mar. 30, 2016) (citations omitted). While a need for greater supervision or discipline "may be demonstrated through proof of repeated complaints of civil rights violations" that are not followed by a "meaningful attempt . . . to investigate or to forestall further incidents," *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), "there is no requirement that complaints result in a formal finding of misconduct for such complaints to support findings of failure to supervise. . . ." *Felix v. City of New York*, 344 F. Supp. 3d 644, 662 (S.D.N.Y. 2018). Moreover, there is no bright-line rule for how many complaints there must be, or how recent the complaints must be, to put a municipality on notice of potential liability. *Tieman v. City of Newburgh*, No. 13 Civ. 4178(KMK), 2015 WL 1379652, at *20 (S.D.N.Y. Mar. 2, 2015). Plaintiff sufficiently pleads such a claim here.

First, Plaintiff demonstrates that the DA's Office "plainly knew, to a moral certainty, that ADAs would make probable cause assessments, offer testimonial evidence in court, confront false or misleading testimony, and acquire *Brady* material 'because these are basic facets of an ADA's job.'" *Buari*, 530 F. Supp. 3d at 406 (quoting *Bertuglia v. City of New York*, 839 F. Supp. 2d, 703 738 (S.D.N.Y. 2012) (citing *Walker*, 974 F.2d at 300)).

Second, Plaintiff sufficiently demonstrates that Defendant was on notice of misconduct and failed to investigate and discipline the misconduct. Specifically, Plaintiff's list of decisions discussing prosecutorial misconduct "plausibly permits a reasonable inference that [the DA's

10

Office] should have been aware or were on notice of" deficiencies with respect to prosecutorial conduct. *Buari*, 530 F. Supp. 3d at 406. Plaintiff goes on to sufficiently allege that Defendant failed to investigate or discipline the misconduct. Specifically, Plaintiff cites to a lack of disciplinary records concerning instances of misconduct; Plaintiff indicates that in response to records requested pursuant to the Freedom of Information law, the Defendant responded that it has no records of any discipline imposed against any attorney at the DA's Office from January 1, 1998 to present. Compl. ¶ 178. Further, Plaintiff indicates that the DA's Office had no records of any discipline imposed after convictions were overturned due to misconduct from January 1, 1998 to present, *id.* ¶ 179, nor did the DA's Office investigate an instance of alleged misconduct or have a system to oversee supervision and discipline of prosecutors in the office, *id.* ¶¶ 214, 215.

Finally, it is reasonable to infer that a failure to discipline prosecutors in connection with prosecutorial misconduct, including the failure to disclose *Brady* information, would cause constitutional violations. *See Buari*, 530 F. Supp. at 406; (citing *Walker*, 974 F.2d at 300 ("[W]ithholding *Brady* material will virtually always lead to a substantial violation of constitutional rights."); *Bertuglia*, 839 F. Supp. 2d at 739 ("[W]here an assistant district attorney commits misconduct . . . or violates their obligations under *Brady*, those actions will frequently result in the violation of citizens' constitutional rights.")).

Therefore, while Plaintiff's *Monell* claim fails under a widespread practice theory, it survives under a theory of failure to discipline and Defendant's motion on this ground is DENIED.

## II.   Disclosure of Impeachment Materials

Finally, Plaintiff asserts that Defendant had a policy of training prosecutors that impeachment evidence of prosecution witnesses was not required to be disclosed and that Defendant had a policy of not taking notes when interviewing potential trial prosecution witnesses to make sure evidence was not recorded and therefore, did not have to be disclosed.

In support of such claims, Plaintiff asserts that the DA's Office's creation of a "*Giglio* committee" in 2020 demonstrates the existence of such an unlawful policy. *See* Compl. ¶ 167. Indeed, Plaintiff asserts that since the establishment of such committee, the DA's Office has sent "hundreds of letters to local criminal defense attorneys admitting that in specific cases, exculpatory and impeachment materials of prosecution witnesses were withheld, which may have caused defendants to be wrongfully convicted." ECF No. 9 at 27 (citing Compl. ¶ 168). Plaintiff further asserts that such policy has been in effect since 1985, when former District Attorney, Howard Relin, was in office. *See* Compl. ¶¶ 145, 148. Specifically, Plaintiff asserts that the DA's Office would fire employees who raise concerns that evidence was being suppressed or hidden. *See id.* ¶ 147. Plaintiff points to an incident involving Melinda C. Frank, who, according to Plaintiff, was fired for raising concerns that an ADA was refusing to interview witnesses whose testimony could potentially aid a defendant, and an incident involving Louis P. Pilato who was allegedly fired for informing a judge that the ADA handling a claim was violating *Brady*. *Id.* ¶¶ 148, 149. Plaintiff alleges such policies have continued.

The Court finds such allegations to be insufficient to establish a *Monell* claim here. As discussed above, "[t]o demonstrate a *de facto* policy or custom through a widespread practice, a plaintiff must 'show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.'" *Buari*, 530 F. Supp. 3d at 398 (quoting *Amnesty America*, 361 F.3d at 126 (citations omitted)). Plaintiff may adequately plead the existence of *de facto* customs or policies "by citing to complaints in other cases that contain similar allegations." *Gaston*, 2018 WL 3336448 at *6 (citations omitted).

First, Plaintiff does not cite to any similar cases to support the allegation that the DA's Office had a policy of not taking notes here,[6] instead, Plaintiff makes conclusory assertions that such policy exists. *See, e.g.*, Compl. ¶¶ 131-135, 225. This is insufficient to plead a *Monell* claim. *Connick*, 563 U.S. at 61 (Plaintiff must demonstrate that a policy is "so persistent and widespread as to practically have the force of law").

The same is true of Plaintiff's claim that the DA's Office had a policy of not disclosing impeachment evidence. Even accepting as true Plaintiff's allegations that two former ADAs were fired from their position in retaliation for disclosing improper practices, that alone does not support the claim that failing to disclose information was a widespread practice. *See, e.g.*, *Jones v. Town of East Haven*, 691 F.3d 72, 85 (2d Cir. 2012) (two or three instances is insufficient evidence to establish a policy of improper conduct). Nor does the existence of a *Giglio* committee and the committee's recognition that evidence was withheld in various cases, *see* Compl. ¶ 168, demonstrate the existence of an unlawful policy of failing to disclose information. *See, e.g.*, *Jackson v. Nassau County*, __ F. Supp. 3d __, 2021 WL 3207168, at *19 (E.D.N.Y. July 28, 2021) (finding that two investigators, on two occasions, who were found to have committed unconstitutional conduct, did not demonstrate a policy or custom of unconstitutional conduct). Indeed, Plaintiff cannot point this Court to any case where a court found such de minimis allegations sufficient to establish such a claim. *See generally*, ECF No. 9 at 26-29.

Therefore, such claims must be DISMISSED.

---

[6] In *United States v. Rodriguez*, the Second Circuit held that the government does not violate *Brady* by merely failing to take notes of its interviews with witnesses. 496 F.3d 221, 224-25 (2d Cir. 2007).

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss, ECF No. 5, is GRANTED IN PART and DENIED IN PART.  Plaintiff's *Monell* claim based on a failure to discipline may proceed and Plaintiff's remaining claims are DISMISSED.

IT IS SO ORDERED.

Dated:  December 27, 2021
          Rochester, New York

_____
HON. FRANK P. GERACI, JR.
United States District Judge
Western District of New York